Howeld, J.
This suit is brought on the following instrument:
“$1001 00. One day after date we or either of us promise to pay E. Cooper, or order, one thousand and one dollars, in gold, the same having been borrowed from him.”
“September 4th, 1864.” (Signed) “Thompson, Adams & Thamer.”
It is alleged that said firm is a commercial firm, and compossed of D. W. Thompson, A. Addison, W. R. Adams and Jasper Thayer, and that the said sum of money was loaned at the special request of the said Addison, who has appealed from a judgment against him alone. His defence is, that the money was borrowed to be used, to the knowledge of the plaintiff, in the -business of blockade-running, then carried on by defendants.
The proof is satisfactory that appellant effected the loan for the purpose of lending it again to the Confederate General, then in command of that district, for a private use, and that this act of accommodation would, in the opinion of appellant, result to the advantage of said firm in their operations; that the plaintiff loaned Especially on the credit of the appellant and Thompson, two of the members of the firm, and that Addison promised to return the amount in gold. The operations.of the firm were undoubtedly illicit, but, we think, the liability of the appellant for this loan is not affected or destroyed by the character of the firm’s business, as the transaction with plaintiff was outside of that business, and was not in itself illegal. The expectation of advantage or favor entertained by the appellant does not appear to have been a motive or object on the part of plaintiff in making the loan, and there is nothing to show that he expected the money to be used illegally, or that it was so used.
Judgment affirmed, with costs.
' Petition for a Rehearing, by Race, Foster & F. T. Merriclc. — The petition of rehearing of Ashford Addison respectfully represents, that he thinks the judgment pronounced against him erroneous for the reasons which follow:
It may be laid down as a rule, under the statute which admits parties to recover upon their own testimony, that, where they place themselves on the stand as witnesses, their testimony should, like their pleadings, be Construed against themselves. ' Eor men, testifying under the strong bias of interest, will state their cases as favorably as possible for themselves.
*185 Taking plaintiff’s testimony, we think we may assert that it clearly appears:
1st. That Thompson, Adams & Thayer -were employed as contractors to get out, for the use of the Confederate service, from and through the Federal lines, supplies and munitions of war. That was their business.
2d. That the plaintiff, at the time the money was lent, was engaged in getting out such supplies for these said Confederate contractors.
3d. Ashford Addison was an officer in the Confederate service, assisting' in getting out such military supplies, and interested in the profits of such unlawful business.
4th. General Hodge, who was to get the gold, was in the Confederate service, and commanding at that post where the gold was lent; and, taking plaintiff’s own version of the affair, he, plaintiff, loaned the money to Ashford Addison, who was engaged in this unlawful and treasonable business to enable him to make “a big thing” by the influence it would give him with the Confederate General Hodge, who commanded the district, and who desired the gold to send to his family.
5th. The plaintiff took the note of Thompson, Adams & Thayer without Addison’s signature to the same. The loan was, therefore, to the partnership formed for this illegal business as well as to Addison, and so the suit is brought.
6th. After or about the time of loaning the money to the firm, Cooper received either forty-six or thirty-six bales of cotton, at thirty-five cents per pound, worth, taking the medium, say forty-one bales, $6,742, according to his own statement.
In proof of the above propositions let ns examine the plaintiff’s own testimony. _ He says, on page 23, “Mr. Addison told him he wanted the gold for himself, Mr. Thompson and Mr. Thayer; and Mr. Thayer gave him the note sued on, and signed his own name, that of Mr. Thompson, and left Mr. Addison’s name out.” His name was left out because it was understood that his name was not to be used, but that he was a partner. * * * Addison “ said if he could get one thousand dollars in gold, we could make the party believe we were the moneyed men; and he said it was for Mr. Hodge, and the we, referred to, meant, I guess, Thompson, Adams, Thayer and himself, or the concern.” Cooper’s Testimony, pages 23 and 24.
This shows clearly that the gold was lent for the firm, engaged in getting out the stores. He then proceeds to say, (page 24,) “I had other dealings with the firm, getting out goods and supplies for them, but had no dealings after the gold was loaned, I don’t think. I mean, by supplies, bagging and rope, whiskey, perhaps, medicines, percussion-caps, etc. We got out boots and shoes, but no guns.”
Again: “The firm was engaged in buying supplies from me, and bringing them up here to sell again. I suppose they were acting for the Confederate authorities. It was so understood. I was acting for them. I was getting the supplies for them, and paid for the goods myself, and then sold to the firm, as well as to any other parties wishing to purchase. I always understood the firm of Thompson, Adams & Thayer was acting for the Confederate authorities. * * * Page 25.
“We bought supplies away below Baton Rouge, on the river, and brought them up. Sometimes, we bought at my place, but purchased all of them on the east side of Amite river. I knew the goods were blockade goods and bought of blockade runners. ” Page 25.
“The firm delivered me thirty-six or forty-six bales of cotton; can’t say exactly how much or how many bales; nor when, whether before or after the date of the note sued on.
“Mr. Addison told me the gold was for General Hodge, who was, I think, commanding this military district. I mean Confederate military district. Mr. Addison said he wanted the gold for General Hodge, who wanted it for his family; that with it he could use General Hodge, and make a big thing out of it. He said General Hodge’s family were in Kentucky.” Page 26.
*186 Now, coupling this expression, with what plaintiff says, on pages 23 ahd 24, that Addison said “if he could get “one thousand dollars in gold, we could make the party believe we were the moneyed men,” etc, and it is manifest, the big thing was the anticipated success in getting supplies for the Confederate army, with an immediate profit to the firm.
He says, he was acting for the firm, in defeating the blockade established by the Government of the United States, and employed in getting out these contraband goods. In other words, all parties were actively engaged in evading the blockade established by the Government of the United States, ánd-turning their resources into means of defence against the Government of the United States. It was, in other words, active war against the Government of the United States, and no one, we think, can doubt, when we consider the object both of plaintiff and the firm, and of Maj. Addison, Confederate States Quarter-master, and Confederate Generals Taylor and Hodge, what business was to be advanced by “the big thing.”
The principle to be decided in this case is so important, that we trust the Court will have patience with us while we examine the case still further.
To escape the inevitable consequences upon his case, of a simple loan to the firm, knowing, as plaintiff did, its aim and purposes, he has resorted to the expedient of showing that this particular money was not intended for the firm, though lent to it, but was intended for a “ Confederate Quarter-master Addison to send to Confederate General Hodge to send to his family in Kentucky.
The question is not now between Confederate and Confederate, and what in a state of nature might be deemed just between them, but it is a question to be decided by the laws of the United States — viewing the war as a rebellion on the part of the Confederates against the Government. Principal and agent, major and general, in violating the blockade, strengthening the Confederacy and resisting the arms of the United States, were all acting unlawfully and in rebellion, if not treasonably according to the laws this Honorable Court administers.
It is not, (so considered,) a case of neidrals selling contraband goods, but it is of subjects, not only giving aid and comfort to the enemy, but actively engaged in rebellion themselves, procuring boots, shoes, percussion-caps, medicines, etc., for the rebels.
Assume, therefore, that the money was lent to the firm, or Quartermaster Addison, to be lent to the Confederate General Hodge, to send to his family, can this view of the case be maintained as legal under our law? Did not the obtaining of the gold by General Hodge give him great aid and comfort? Was it not a very comfortable thing to know, while he was battling for the Confederacy, his wife was safe at home in Kentucky with plenty of gold for her wants? Would it not have greatly cheered the ragged soldiers who followed Jackson and Lee and Taylor and Johnston in their dreadful marches and battles, if gold could have been lent them for their wives and little ones at home? Would not desertions in the Confederate army have ceased? Would not the exertions of the soldiers have been redoubled, and would the war have ended as soon as it did?
•The furnishing of money to the enemy is the giving him aid and comfort, as it is well said by writers on the subject. Cooper knew his money was to be given to a Confederate general to aid him in sending money home to his family, for whom he was bound to provide, and comfort him by the knowledge that his family were not in want, and that instead of going home to provide for them, he could remain in the field and at the front.
This was not merely against the policy of the law, but it was in its nature treasonable. Wharton says: “Therefore, if citizens of the United States join public enemies in acts of hostility against this country, or even against its allies, or deliver up its castles, forts? or ships of war, to its enemies through treachery, or in combination with them; or *187 raise troops for the enemy, or supply them with money, arms or intelligence, although such money, intelligence, etc., be intercepted, and never reach them: all these are cases of adhering to the enemies of the United States, and the parties guilty of high treason under the Federal Constitution.” Wharton’s Crim. Law, ed. 1852, p. 580.
The law does not regard the pretense under which the money is furnished: all things which the enemy can use must be withheld from him. It was unlawful to feed General Hodge, harbor him for an hour, or entertain him in one’s house, or to loan him a horse while his business was making war on the United States, and in like manner was it unlawful to supply him with gold for his necessities, or for any purpose whatever;' for, if the enemy could lawfully take gold under any pretense, there would be no end to pretenses, and all things would become lawful. Every Confederate soldier would have had some pre'-ense’to get gold, if they had been near the points where gold came through the lines, and blockade runners had been so facile and convenient as the plaintiff was to Major Addison and General Hodge of the Confederate service.
It may do as declamation to say, that there was no harm in assisting Mrs. Hodge: she was not in the rebel army, and it was only charity to help her. The money was not lent to her, nor did she ever receive one dollar of it, as we are able to show, and should have done, if we could have anticipated what the plaintiff would swear to. The money was borrowed for General Hodge under the pretense that it was to be sent to his family, it seems. It was for him. and thus unlawful. It would be equally so, if lent to Ashford Addison, Confederate quarter-master, while in tbe service of the Confederacy, or the firm of Confederate contractors. Is it unlawful to harbor or feed a Confederate soldier, and lawful to lend gold to a Confederate quarter-master, whose business was evading a blockade and supplying the Confederate army?
It was,- also, equally unlawful to lend the firm of Thompson, Adams & Thayer money, knowing their business. See Milne v. Davidson, 5 N. S. 409, where a lease was declared unlawful, because the lessor knew the building was intended to be used as a hospital in a district of the city prohibited by the ordinance. See also, Mulhollan v. Voorhies, 3 N. S. 46; 17 L. R. 118; Davis v. Caldwell, 2 Rob. 271; McHatton v. Pratt, 11 An. p. 264; Schmidt v. Barker, 17 An. 264.
It now remains to examine the authorities cited by appellees’ counsel.
The case in 1 Paine’s C. C. Reports, 166, United Slates v. Barker, is in direct conflict with the authorities, and it seems to be so considered by the Judge. But, if it were not, it has no affinity with this case. Drawing a bill of exchange; without concert with an alien enemy, is a very different thing from the actual furnishing of gold to an enemy in service and under arms. In the case United Stales v. Barker, 12 Wheaton, 560, the bills of exchange were drawn for the Government, and there was only a question of diligence. It is not the same case as the preceding; the first was in New York, the other from Pennsylvania.
The ease in Wallace, (Brooks v. Martin, 2 Wallace, 80,) was on the equity side, where the rules are less rigid than at law; and there it was simply held that as between partners, where illegal gains, malum prohibitum had been invested in other property, the Court would not refuse its assistance on that ground. It was not like the case of the Highwayman in chancery, for the division of gains upon Hounslaw Heath, where the unlawful gain itself was to be divided. It was a mere illegality, not malum in se, and the proceeds had lost their idenity and character by reinvestments.
In Pratt v. McHatton, 12 An. 264, a partner was not allowed to charge his co-partner for illegal hire of convicts. And such would no doubt have been the decision of the United States Supreme Court on a similar question, as there had been no reinvestment, and the partner demanded of the Court to allow him credit on the account, for the gain made by his unlawful act.
But, in the ease at bar, the plaintiff demands restitution for money advanced by him, to enemies in arms against the Government of the *188 United States, when the mere giving them food and shelter, would have been in the eye of the law a treasonable act. See 17 An. p. 264.
Taking the law as our guide, and setting aside the declamation with which the defendant, Addison, has been so fiercely assailed; and it is difficult to believe that this Court will, on a review of the authorities, sustain the proposition that it is lawful, knowingly, to lend gold to a firm engaged in supplying the enemies of the Government with the means of operation, to be lent by them to an officer in the same service, under the pretense that he desires the money to be sent to his family.
Again, the plaintiff admits he received thirty-six or forty-six bales cotton worth, calculating by his own data, $6,742. While his memory is so precise about the gold, it is, it must be confessed, a little obtuse about the cotton. But it was received about the same time the gold was paid. This proof is in the record without objection, and Cooper fixes the price of the cotton, (p. 31,) at thirty-five cents. Now, is it just that he should have the benefit of the cotton without allowing a credit for it If his testimony is good to prove the debt, it ought also to be good to discharge it. If the Court can consider the contract for the gold, it can, in like manner, consider the cotton received by plaintiff which discharges the same.
Maj. Addison, the defendant, was captured about the time the note was given, or previously, and confined in a Northern prison until the close of the war. He was, therefore, unable to prepare the case so thoroughly as he can now do since he has learned from the plaintiff’s testimony, by which he was surprised on the trial, the nature of the same.
In conclusion, we remark, the difference between this case, and an ordinary case, (where assistance has been rendered a criminal, such as a thief, or a perjurer, or a murderer even,) consists in this, that it is not unlawful to assist such persons or their families, so you do not make yourself an accessory after the fact, while it is unlawful to assist or give aid or comfort to rebels, or enemies in arms against the Government. What is lawful in the one case, is unlawful in the other.
The principle involved in this case is so important that we are unable to do it full justice in this petition. Wherefore, the appellant, by his counsel, prays that the judgment rendered by your Honorable Court may be set aside; that the judgment of the lower court be reversed, anda final judgment be rendered in favor of appellant, or that a new trial be awarded him, and for such other relief as to Your Honors shall seem right.
Rehearing refused.